# 14-890-br

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆ ◆

In the Matter of: Lehman Brothers Inc.,

*Debtor.*

CARVAL UK LIMITED, as manager of CVF Lux Master S.a.r.l,
the assignee of Doral Bank and Doral Financial Corporation,
HUDSON CITY SAVINGS BANK,

*Claimants-Appellants,*

—against—

JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman
Brothers Inc., SECURITIES INVESTOR PROTECTION CORPORATION,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEE JAMES W. GIDDENS, AS TRUSTEE FOR THE SIPA LIQUIDATION OF LEHMAN BROTHERS INC.

JAMES B. KOBAK, JR.
MICHAEL E. SALZMAN
BEATRICE AISHA HAMZA BASSEY
SAVVAS A. FOUKAS
KATHLEEN A. WALKER
HUGHES HUBBARD & REED LLP
1 Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Appellee
   James W. Giddens, as Trustee
   for the SIPA Liquidation of
   Lehman Brothers Inc.*

## <u>Federal Rule of Appellate Procedure 26.1 Statement</u>

Appellee James W. Giddens is acting in his capacity as trustee for the

Securities Investor Protection Act liquidation of Lehman Brothers Inc.

Dated: New York, New York
   September 24, 2014

      HUGHES HUBBARD & REED LLP

      By: <u>/s/ Michael E. Salzman</u>
        Michael E. Salzman
      One Battery Park Plaza
      New York, New York 10004
      Telephone: (212) 837-6000
      Facsimile: (212) 422-4726
      Email: salzman@hugheshubbard.com

      *Attorney for James W. Giddens,*
      *as Trustee for the Securities Investor*
      *Protection Act Liquidation of Lehman*
      *Brothers Inc.*

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................1

COUNTER-STATEMENT OF THE ISSUE PRESENTED.....................1

COUNTER-STATEMENT OF THE CASE ..........................................2

    Repurchase Transactions and the Master Repurchase Agreements ...............4

        Repurchase Transactions.........................................................4

        Repos Are Governed by an Industry-Standard Master Repurchase Agreement .....................................................6

        The Customer Protection Rule ...............................................9

    Doral's Repo Transactions with LBI...............................................11

    LBI's Books and Records Show that LBI Did Not Hold Any Property for Doral on the Filing Date ........................................................12

        Doral Chose to Open DVP Accounts Instead of Custodial Accounts ............................................................................12

        Doral's Accounts Were Empty on LBI's Filing Date.........................13

        Doral Seeks Contractual Damages for LBI's Breach of the MRA ...........................................................................14

    The Bankruptcy Court Proceedings.............................................14

    The District Court Proceedings ..................................................16

SUMMARY OF THE ARGUMENT ....................................................18

STANDARD OF REVIEW ...............................................................19

ARGUMENT:  DORAL'S CLAIMS ARISING FROM BREACHED REPO CONTRACTS DO NOT QUALIFY FOR CUSTOMER PROTECTION UNDER SIPA...............................................................19

**TABLE OF CONTENTS**
**(continued)**

Page

A.   DORAL CANNOT BE A CUSTOMER BECAUSE IT DID
     NOT ENTRUST SECURITIES TO LBI. ....................................................21

     1.   LBI Did Not Act as Doral's Fiduciary. ...............................................22

          a.   Entrustment Requires a Fiduciary Relationship Where a
               Broker Acts for Its Customer's Benefit. ....................................22

          b.   Doral Did Not Have a Fiduciary Relationship with LBI. .........27

     2.   Doral Engaged in Repo Financing Transactions as an
          Unprotected Creditor Rather than as an Investor-Trader
          Protected by SIPA. ..............................................................................31

          a.   The Transfer of Securities for Use as Collateral in a Repo
               Transaction Serves a Financing Purpose Rather than a
               Trading Purpose. ........................................................................31

          b.   Doral's Purported Motives for Engaging in the Repo
               Transactions Do Not Alter Its Status as a Mere Secured
               Borrower. ....................................................................................34

B.   DORAL DOES NOT QUALIFY AS A SIPA CUSTOMER
     UNDER THE TEXT OF THE STATUTE. ..................................................39

     1.   The District Court Properly Rejected CarVal's
          Unrealistic Interpretation of the SIPA Customer
          Definition Because the Statute Must Be Read with a
          View to Its Purpose. ...........................................................................39

          a.   The Repo Claims Are Not "On Account of Securities
               Received, Acquired, or Held." ...................................................40

          b.   LBI Did Not Receive the Securities "From" or "For"
               Doral's "Securities Accounts." ..................................................41

          c.   LBI Did Not Receive, Acquire, or Hold the Securities
               "with a View to Sale" or "Pursuant to Purchases." .................42

     2.   Doral's DVP Accounts Did Not Hold Positions, So
          Doral's "Net Equity" Calculation Under SIPA Is Zero. ....................43

**TABLE OF CONTENTS**
**(continued)**

**Page**

3.    CarVal's Congressional Intent Arguments Fail Under
       Basic Principles of Statutory Interpretation. ........................................45

C.    *BEVILL* DOES NOT CONTROL, AND IS
       DISTINGUISHABLE AND OUTDATED. ....................................................49

CONCLUSION .........................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791 (6th Cir. 1995).........................24

*Bell v. Bell*, 225 F.3d 203 (2d Cir. 2000).................................................45

*In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011).........21, 31,44

*Brown v. Gardner*, 513 U.S. 115 (1994) ...................................................46

*Bruesewitz v. Wyeth LLC*, 131 S.Ct. 1068 (2011) .......................................48

*Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012)..............32

*CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*, 13 Civ. 5381(DLC), 2013 WL 5272937 (S.D.N.Y. Sept. 18, 2013)..............................16

*CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*, 506 B.R. 346 (S.D.N.Y. 2014).............................................................*passim*

*In re CBI Holding Co.*, 529 F.3d 432 (2d Cir. 2008) ...............................19

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)..................................................................46

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002)........................................46

*Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 67 B.R. 557 (D.N.J. 1986)...................................................*passim*

*De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002)................25

*Girourard v. United States*, 328 U.S. 61 (1946)........................................48

*Hibbs v. Winn*, 542 U.S. 88 (2004).....................................................46

*In re Hugo Neu & Sons, Inc.*, DTA No. 811472, 1994 N.Y. Tax LEXIS 711 (N.Y. Div. Tax App. Dec. 15, 1994) ................................................35

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...............................46, 47

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988).................................43

*Kruse v. SIPC (In re Bernard L. Madoff Inv. Sec. LLC)*, 708 F.3d 422 (2d Cir. 2013) ......................................................................................19

*In re Lehman Bros. Inc.*, 492 B.R. 379 (Bankr. S.D.N.Y. 2013) ....................*passim*

*McCarthy v. Bronson*, 500 U.S. 136 (1991) ............................................39

*Mid–Island Hosp., Inc. v. Empire Blue Cross and Blue Shield*, 276 F.3d 123 (2d Cir. 2002)................................................................................26

*In re Old Naples Sec., Inc.*, 223 F.3d 1296 (11th Cir. 2000)....................24

*Pan Am. World Airways, Inc. v. Civil Aeronautics Bd.*, 380 F.2d 770 (2d Cir. 1967) ..............................................................................................47

*In re Primeline Sec. Corp.*, 295 F.3d 1100 (10th Cir. 2002)....................24

*SEC v. Drysdale Sec. Corp.*, 785 F.2d 38 (2d Cir. 1986)................................*passim*

*SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ......................................*passim*

*SEC v. Kenneth Bove & Co.*, 378 F. Supp. 697 (S.D.N.Y. 1974) ..........................44

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974) .............................19, 20

*SEC v. SIPC*, 758 F.3d 357 (D.C. Cir. 2014)................................................22, 24, 31

*SIPC v. Barbour*, 421 U.S. 412 (1975).................................................22

*SIPC v. Exec. Sec. Corp.*, 556 F.2d 98 (2d Cir. 1977).....................................*passim*

*SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir. 1976) .......................3, 21

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125 (2d Cir. 2006) ........................................................................20, 31, 43, 47

*Tew v. Res. Mgmt. (In re ESM Gov't Sec., Inc.)*, 812 F.2d 1374 (11th Cir. 1987) ..............................................................................28, 49, 50, 51

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Thomson McKinnon Sec., Inc. v. Residential Res. Mortg. Invs. Corp. (In re Residential Res. Mortg. Invs. Corp.)*, 98 B.R. 2 (Bankr. D. Ariz. 1989) ...........52

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) (en banc) ...........24, 25, 26

*United States v. Manko*, 979 F.2d 900 (2d Cir. 1992) .............................................35

*United States v. Price*, 361 U.S. 304 (1960) ...........................................................48

*In re Weis Inc.*, 73 Civ. 2332, 1977 WL 1043 (S.D.N.Y. Sept. 29, 1977).............37

*World Airways, Inc. v. Pan Am. World Airways, Inc.*, 391 U.S. 461 (1968) (per curiam).................................................................................................47

*Zuber v. Allen*, 396 U.S. 168 (1969) .......................................................................48

### STATUTES

11 U.S.C. § 741 ...................................................................................................28, 48

15 U.S.C. § 78c-5 .....................................................................................................48

15 U.S.C. § 78fff-4....................................................................................................44

15 U.S.C. § 78*lll*.................................................................................................*passim*

28 U.S.C. § 158 ...........................................................................................................1

28 U.S.C. § 1291 .........................................................................................................1

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376-2223, codified at 12 U.S.C. §§ 5301 *et seq.* (2010).............................................................................................20, 47, 48

Government Securities Act of 1986, Pub. L. No. 99-571, 100 Stat. 3208 (1986).................................................................................................51

### REGULATIONS

17 C.F.R. § 240.15c3-3 ......................................................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

Page(s)

LEGISLATIVE AND ADMINISTRATIVE MATERIALS

*Broker-Dealers; Maintenance of Certain Basic Reserves*, Exchange Act
Release No. 34-9856, 37 Fed. Reg. 25224 (Nov. 24, 1972) .............................10

*Customer Protection Rule*, Exchange Act Release No. 34-24778, 52 Fed.
Reg. 30331 (Aug. 6, 1987) ...........................................................................51, 52

H.R. 4173, 111th Cong. § 7509 (Dec. 10, 2009).......................................................47

H.R. 4173, 111th Cong. § 983 (May 20, 2010) ........................................................47

H.R. Rep. No. 91-1613 (1970).............................................................................37, 38

H.R. Rep. No. 111-517 (2010) (Conf. Rep.) ...........................................................47

*Reserves and Related Measures Respecting the Financial Responsibility of
Brokers and Dealers*, Exchange Act Release No. 34-9388, 36 Fed. Reg.
22312 (Nov. 24, 1971).......................................................................................10

*Section by Section Explanation of H.R. 8331 Amendments to Securities
Investor Protection Act: Hearing before the Subcomm. on Securities of
the Senate Comm. on Banking, Housing and Urban Affairs*, 95th Cong.
(1978)...................................................................................................................24

*Securities Investor Protection: Hearings on H.R. 13308, H.R. 17585, H.R.
18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce
and Fin. of the H. Comm. on Interstate and Foreign Commerce*, 91st
Cong. (1970) ........................................................................................................22

U.S. Gov't Accountability Office, GAO/GGD-98-153, *Risk-Based Capital,
Regulatory and Industry Approaches to Capital and Risk* (1998) ....................30

OTHER AUTHORITIES

Ben S. Bernanke, Chairman, Fed. Reserve, *Some Reflections on the Crisis
and the Policy Response*, Address at the Russell Sage Foundation and
The Century Foundation Conference on "Rethinking Finance" (Apr. 13,
2012) .....................................................................................................................5

*Black's Law Dictionary* 564 (5th ed. 1979)...........................................................29

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

1 *Collier on Bankruptcy* ¶ 12.12[4] (16th ed. 2012)..........................................23, 31

Frank J. Fabozzi, *The Handbook of Fixed Income Securities* (8th ed. 2012)............5

Henry M. Paulson, Jr., *On the Brink: Inside the Race to Stop the Collapse of the Global Financial System* (2010) .....................................................................5

Appellee James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, submits this brief in opposition to the appeal filed by CarVal Investors UK Limited ("CarVal"), as Manager of Assignee of Doral Bank and Doral Financial Corporation (collectively, "Doral").[1]

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal under 28 U.S.C. §§ 158(d) and 1291.

## COUNTER-STATEMENT OF THE ISSUE PRESENTED

Did the District Court correctly determine that Doral's claims arising from repurchase agreements ("repos") with LBI were not "customer" claims under SIPA, and therefore not entitled to be paid from the fund of customer property reserved for customers of the broker-dealer, where (1) Doral had not entrusted any property to LBI, (2) the repos were bilateral, principal-to-principal transactions by which title to the repo'd securities passed to LBI in exchange for a simultaneous payment of cash to Doral, (3) LBI had the right to, and did, rehypothecate the repo'd securities during the terms of the repos, (4) Doral only had DVP accounts at

---

1. Appellant CarVal acquired Doral's claims pursuant to a transfer agreement filed with the Bankruptcy Court on December 23, 2010. (A–1043-48.)

LBI for the repos, which were holding no property for Doral on the date LBI was put into liquidation, and (5) LBI—in accordance with the SEC's Customer Protection Rule—had segregated no property for Doral in its special reserve account?

## COUNTER-STATEMENT OF THE CASE

This is an appeal from the United States District Court for the Southern District of New York decision[2] issued on February 26, 2014, affirming the decision of the Bankruptcy Court[3] that confirmed the Trustee's determination that Doral and two other claimants[4] were not customers under SIPA.  CarVal filed an appeal to this Court on March 24, 2014.  (A–5321-23.)[5]

The two courts below, adhering to well-settled rulings of this Court, held that claims for damages arising from Doral's principal-to-principal repo

---

2.  The District Court decision (*see* SPA–42-67) was subsequently published at *CarVal Invs. UK Ltd. v. Giddens* (*In re Lehman Bros. Inc.*), 506 B.R. 346 (S.D.N.Y. 2014).  This decision will be cited herein in parallel form as follows:  "SPA __ (Dist. Court Decision at __)."

3.  The Bankruptcy Court decision (*see* SPA–1-21) was subsequently published at *In re Lehman Bros. Inc.*, 492 B.R. 379 (Bankr. S.D.N.Y. 2013).  This decision will be cited herein in parallel form as follows:  "SPA __ (Bankr. Court Decision at __)."

4.  The other two claimants, Hudson City Savings Bank and the Federal Deposit Insurance Corporation (as receiver of Westernbank Puerto Rico), also appealed to the District Court but elected not to press any appeals in this Court.  The District Court's decision is final as to these claimants.  The vast majority of LBI's repo counterparties are not disputing that their claims are entitled only to general creditor treatment rather than protected customer status.

5.  Citations to "A–__" and "SPA–__" refer to the Joint Appendix and the Special Appendix, respectively (each of which was filed in this case on June 27, 2014).

transactions with LBI do not qualify for preferred, customer status under SIPA because Doral had not entrusted securities (or cash) to LBI. Entrustment is the *sine qua non* of customer status under SIPA. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 236 (2d Cir. 2011); *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir. 1976); *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974). Repos are arm's-length financing transactions in which securities are sold for cash and then, later on, resold for cash. As this Court observed in *SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir. 1986), a "repo merely imposes a contractual obligation to deliver identical securities on the settlement date set by the repo contract." This appeal calls for the Court to confirm that the "contractual obligation" created by a repo is not a customer claim under SIPA.

This case arises from LBI's contractual default with respect to 11 repo transactions with Doral having an aggregate Purchase Price (defined below) of $504,027,875. (A–494-503.) All of these transactions were done pursuant to industry-standard Master Repurchase Agreements, and were "bilateral delivery" repos by which LBI was given title and possession of the securities with the full rights of "selling, transferring, pledging or hypothecating" them during the term of the repos. (SPA–47-48 (Dist. Court Decision at 350).)

**Repurchase Transactions and the Master Repurchase Agreements**

  ***Repurchase Transactions***

   A repo is a financial transaction that occurs in two steps. (SPA–45 (Dist. Court Decision at 348).) In the first step, the "Seller" delivers marketable securities, such as U.S. Treasury securities, (the "Purchased Securities") to a counterparty, the "Buyer," on a specified "Purchase Date" in exchange for a specified amount of cash (the "Purchase Price"). (*Id.*) At the time of the first step of the repo, the parties simultaneously agree that in the second step of the repo, on a specified date in the future called the "Repurchase Date," the Seller will repurchase the Purchased Securities in exchange for a cash payment to the Buyer in the amount of a specified price (the "Repurchase Price"). (*Id.*) The Repurchase Price is equal to the original Purchase Price plus an implied interest payment earned on the cash originally transferred by the Buyer to the Seller that is calculated at an agreed-upon percentage called the "repo rate." (*Id.*) When viewed from the Seller's perspective, the repurchase transaction is called a "repo," whereas when the same transaction is viewed from the Buyer's perspective, it is called a "reverse repo." (SPA–45 (Dist. Court Decision at 348).)

   A repo transaction is structured as a pair of sales. However, in practical terms, a repo functions as the economic equivalent of a secured loan transaction. As the cash lender, the Buyer in a repo earns the repo rate interest on the cash it

transfers to the Seller as cash borrower. (SPA–45 (Dist. Court Decision at 348).)
The Purchased Securities act like collateral for the cash the Buyer delivers to the
Seller in the first step of the transaction, and in order to over-secure the obligation
to repurchase the collateral, the market value of the Purchased Securities on the
Purchase Date exceeds the Purchase Price by a percentage difference agreed upon
by the parties, called the "haircut." (SPA–45 (Dist. Court Decision at 348).) It is
universally understood in the financial world that repos are a form of secured
funding.[6]

There are different delivery methods used for transferring securities in repo
transactions, but this case involves only "bilateral delivery" repos. In a bilateral
delivery repo, the Seller delivers the securities to the Buyer or its agent at the
outset of the transactions against the transfer of cash. (SPA–47-48 (Dist. Court
Decision at 349); SPA–6 (Bankr. Court Decision at 383).) By contrast, in a

---

6.  (A–1167.) *See* Henry M. Paulson, Jr., *On the Brink: Inside the Race to Stop the Collapse of the Global Financial System* 72, 98 (2010) (explaining that the largest U.S. mortgage originator "had funded its loans in a[] . . . market known as the repurchase, or repo, market, where it could essentially borrow on a secured basis," and later explaining that repos were "[t]echnically purchase and sale transactions, [but] they acted just like secured loans"); Ben S. Bernanke, Chairman, Fed. Reserve, *Some Reflections on the Crisis and the Policy Response*, Address at the Russell Sage Foundation and The Century Foundation Conference on "Rethinking Finance*"* (Apr. 13, 2012) ("In repo agreements, loans are collateralized by financial assets, and the maximum amount of the loan is the current assessed value of the collateral less a safety margin, or haircut."); Frank J. Fabozzi, *The Handbook of Fixed Income Securities* 347 (8th ed. 2012) ("There is a good deal of Wall Street jargon describing repo transactions. To understand it, remember that one party is lending money and accepting security as collateral for the loan; the other party is borrowing money and giving collateral to borrow money.").

safekeeping or "hold-in-custody" ("HIC") repo, the securities are not actually delivered to the Buyer but rather are placed in an "internal safekeeping account" by the Seller, for the Buyer; these securities are segregated from other securities in the Seller's possession, and remain in the Seller's possession and control throughout the duration of the repo. (SPA–47 (Dist. Court Decision at 349); SPA–6 (Bankr. Court Decision at 383).)

### Repos Are Governed by an Industry-Standard Master Repurchase Agreement

Counterparties to domestic repo transactions execute a Master Repurchase Agreement ("MRA"), an industry-standard contract which precisely defines the rights and obligations of both the Seller and the Buyer.[7] (*See* A–454-73.)

Several provisions of this detailed agreement are especially relevant to this appeal. For one, the MRA's language does not indicate that either party is acting as a fiduciary or agent for the other. Rather, the MRA unambiguously describes the relationship between the Buyer and Seller as a "business and contractual relationship" and states that each party represents and warrants that "it will engage in such transactions as principal." (A–459-60 (MRA ¶¶ 10, 12); SPA–46-47 (Dist. Court Decision at 349); SPA–7 (Bankr. Court Decision at 383).)

---

7. Repos involving foreign securities are typically documented through a slightly different form of agreement, a Global Master Repurchase Agreement ("GMRA"). (*See* A–1082-1117.)

6

Similarly, "[t]he MRA includes specific margin provisions designed to protect both parties with respect to changes in the value of the Purchased Securities during the term of the repo." (SPA–7 (Bankr. Court Decision at 383); *see* A–1169-70; A–457-58 (MRA ¶ 4(a), (b)).) These mark-to-market provisions allow the Buyer to demand delivery of additional securities (or cash) when the market value of the Purchased Securities decreases, and likewise allow the Seller to demand the return of securities (or cash) when the market value of the Purchased Securities increases, an effective means to "rebalance the respective positions of the parties" and thereby protect against both over-collateralization and under-collateralization. (SPA–7 (Bankr. Court Decision at 383); *see* SPA–47 (Dist. Court Decision at 349); A–457-58 (MRA ¶ 4(a), (b)).)

The MRA further provides that, on the Purchase Date, the Buyer acquires "full legal title" to the Purchased Securities. (SPA–47 (Dist. Court Decision at 349); A–4216 (Doral's expert agreeing that, in a repo transaction, the Buyer "does have title" to the securities).) As title-holder, the Buyer is freely permitted under the MRA to "engage in 'selling, transferring, pledging or hypothecating the Purchased Securities.'" (SPA–15 (Bankr. Court Decision at 388) (quoting A–459 (MRA ¶ 8)).) As aptly summarized by the Bankruptcy Court, the MRA provides that "the Buyer is free to use the Purchased Securities for its own purposes until the Repurchase Date." (SPA–7 (Bankr. Court Decision at 383); *see* A–459 (MRA

7

¶ 8).)  Until then, "the MRA affords great latitude to the Buyer" including "complete discretion" over how to use the Purchased Securities to benefit its own business, including selling the securities outright, selling the securities in separate repo transactions, or pledging the securities as collateral for a loan.  (SPA–7 (Bankr. Court Decision at 383); SPA–29; SPA–47 (Dist. Court Decision at 349).) The exception to this rule is in the case of HIC repos—relatively rare in modern-day repo transactions—where the Seller is instead required to segregate the Purchased Securities on the Buyer's behalf for the duration of the transaction. (SPA–20 (Bankr. Court Decision at 383); A–1170, 1173.)

Despite the transfer of legal title to the Buyer, the MRA gives the Seller the benefit of continuing to receive income on the Purchased Securities.  (A–458 (MRA ¶ 5); *see* SPA–47 (Dist. Court Decision at 349).)  Specifically, the MRA obligates the Buyer to make payments to the Seller in "an amount equal to" the coupon interest the Seller would have received from the Purchased Securities had they not been sold to the Buyer.  (A–458 (MRA ¶ 5).)  The MRA also provides the Seller with a limited substitution right, permitting the Seller to substitute different securities for the Purchased Securities so long as the Buyer agrees to the substitution.  (*See* A–459 (MRA ¶ 9(a)).)

The MRA's comprehensive provisions also cover the parties' rights in the event that either defaults prior to the Repurchase Date.  (*See* A–460-62 (MRA

¶ 11).)  Under the MRA, an "Act of Insolvency" with respect to the Buyer or Seller constitutes an automatic "Event of Default," and the Repurchase Date is accelerated so that it is deemed to occur immediately.  (SPA–8 (Bankr. Court Decision at 384); A–461 (MRA ¶ 11(d)(ii)).)  Upon the Buyer's default, "[t]he Seller, in its discretion, may either purchase replacement securities or be deemed to have purchased replacement securities."  (A–461 (MRA ¶ 11(d)).)  The defaulting Buyer is liable to the Seller for any excess of the price paid (or deemed paid) for replacement securities above the Repurchase Price for the undelivered Purchased Securities.  (SPA–8 (Bankr. Court Decision at 384) (citing A–461 (MRA ¶ 11(d)(ii), (e))).)  In light of these contractual remedies, repo counterparties expressly acknowledge in a disclaimer on the execution page of the MRA that they have been advised that "the Securities Investor Protection Corporation has taken the position that the provisions of the [Securities Investor Protection Act] do not protect the other party with respect to any Transaction hereunder."  (A–464 (MRA ¶ 20(a)).)

### *The Customer Protection Rule*

SEC Rule 15c3-3 (the "Customer Protection Rule") is designed to safeguard and restrict the use of a broker-dealer's customers' assets and requires broker-dealers to segregate cash and securities in a special reserve account to protect its customers in the event of the broker-dealer's failure.  17 C.F.R. § 240.15c3-3.  (*See*

*also* A–1171.)  In a SIPA liquidation, these assets become a key part of the fund of customer property from which distributions can be made to customers on a pro rata basis to the extent of their allowed net equity.  The Customer Protection Rule and SIPA work in tandem to foster confidence in the securities markets and provide a safety net to ensure that customers who meet the statutory definition and who have entrusted cash or securities to a broker-dealer can recover as fully as possible in the event of a broker-dealer liquidation without dilution from the claims of general creditors.  *See Brokers-Dealers; Maintenance of Certain Basic Reserves*, Exchange Act Release No. 34-9856, 37 Fed. Reg. 25224, 25224 (Nov. 10, 1972).  As described by the SEC, the Customer Protection Rule works with SIPA to provide "a virtual 100 percent protection" for a broker-dealer's customers in the event of the broker-dealer's failure.  *Reserves and Related Measures Respecting the Financial Responsibility of Brokers and Dealers*, Exchange Act Release No. 34-9388, 36 Fed. Reg. 22312, 22312 (Nov. 24, 1971).  A broker-dealer, however, has no obligation under the Customer Protection Rule to segregate cash or securities relating to its repo transactions, and LBI did not do so with respect to Doral but used the property to finance its proprietary business.[8]  (A–1172-74; A–1353-54); *see* 17 C.F.R. § 240.15c3-3.

---

8.  Again, the exception here is that a broker-Seller must maintain secure custody and control of

(Footnote continued on next page)

***Doral's Repo Transactions with LBI***

Doral was a sophisticated financial institution that was an active participant in the repo market, acting as both a Seller and a Buyer with numerous counterparties, including LBI. Doral had approximately $1.9 billion in outstanding reverse repos and $6 billion in repos as of December 31, 2008. (A–999; A–1056.) Doral personnel were knowledgeable about repos and approached LBI to enter into repo transactions. After shopping around for competing rates from other broker-dealers, Doral negotiated the terms of its transactions with LBI, including the repo rate and margin provisions. (A–1391-93.)

On June 19, 1998, Doral Bank and Doral Financial each executed an industry-standard MRA with LBI. (A–454-73, 474-93.) Doral's MRAs described the relationship between Doral and LBI as "contractual." (A–462, 482 (MRA ¶ 12).) Thus, as the District Court noted, the MRA "disavows any fiduciary, principal-agent relationship." (SPA–58 (Dist. Court Decision at 354); *see* A–459-60, 462, 479-480, 482 (MRA ¶¶ 10, 12).)

---

(Footnote continued from prior page)

Purchased Securities on behalf of the Buyer in a HIC repo transaction. (A–1353-54.)

**LBI's Books and Records Show that LBI Did Not Hold Any Property for Doral on the Filing Date**

### Doral Chose to Open DVP Accounts Instead of Custodial Accounts

LBI maintained a system of accounts to record transactions with its securities customers and other counterparties. (A–1184.) LBI's system of accounts distinguished between (1) custodial, lien-free ("safekeeping" or "segregated") accounts in which LBI would segregate a customer's assets from those assets available for LBI to use in its proprietary accounts, and (2) delivery-versus-payment ("DVP") accounts that were designed to "record transaction activities but would not, and did not, hold any of the Purchased Securities." (SPA–48 (Dist. Court Decision at 349-50); *see* A–1184.) Holders of DVP accounts designated the destination of any payment or delivery by LBI (usually a third-party financial institution) by means of standing instructions maintained in LBI's records. (A–1185.)

Doral chose to open a DVP account with LBI with respect to its bilateral delivery repo transactions with LBI. (A–2954-58.) Doral's DVP accounts recorded transaction activities, but like all DVP accounts, Doral's accounts held no property. (SPA–48 (Dist. Court Decision at 350).) Instead, Doral provided standing instructions to LBI that designated a clearing agent to receive any transfers of cash or securities. (A–1202-05.) The DVP nature of Doral's accounts was confirmed by LBI-issued Client Statements that were regularly sent to Doral

12

without a "Portfolio Details" section that would have recorded any assets held at LBI with respect to the account. (SPA–11-12 (Bankr. Court Decision at 386); A–1301-1326, 1327-45.)

### Doral's Accounts Were Empty on LBI's Filing Date

Consistent with Doral's MRA and standard practice in the industry, LBI was granted full legal title to the Purchased Securities and exercised its complete discretion over how to use the securities to further its proprietary business. (SPA–48 (Dist. Court Decision at 350); SPA–12 (Bankr. Court Decision at 386).) LBI was not required to safekeep or retain the securities at any time, and LBI routinely used the Purchased Securities underlying the Repos for its own purposes, including in repo transactions or collateral pledges to other counterparties. (SPA–47-48 (Dist. Court Decision at 349-50); A–1190-1192.; *see, e.g.*, A–1258-59, 1269-71, 1280-82, 1292-94.) As a result, on the date that LBI commenced liquidation proceedings (the "Filing Date"), the Purchased Securities were either in "the possession of third parties" or in LBI's proprietary account at JPMorgan Chase. (SPA–12 (Bankr. Court Decision at 386, n.15); SPA–48 (Dist. Court Decision at 350).) Moreover, consistent with the Customer Protection Rule and the MRA, LBI did not set aside any cash or securities related to the Repos. (A–1353-54, 1364-65.)

### Doral Seeks Contractual Damages for LBI's Breach of the MRA

LBI's SIPA liquidation constituted a breach of the Doral MRAs, resulting in an automatic termination of the Repos.  (A–460-62, 480-82 (MRA ¶ 11).)  Doral filed two customer claims based on its repo transactions with LBI (the "Doral Claims") that expressly state that Doral "is not owed securities."  (A–523-24, 632-33.)  Rather, the Doral Claims state that "in accordance with the MRA, LBI is liable to [Doral] for the excess of the price deemed by [Doral] for the replacement securities over the repurchase price."  (A–523-24, 632-33.)  That is, Doral seeks the market value of the securities on the Filing Date in excess of the cash that LBI had originally transferred to it and which Doral continued to hold throughout the life of the Repos and never paid back to LBI.  Doral simply seeks contractual damages provided for under paragraph 11(e) of the MRA.

### The Bankruptcy Court Proceedings

After reviewing the Doral Claims, the Trustee issued Notices of Determination which denied SIPA customer treatment and reclassified them as general creditor claims.  (A–679-86.)  Doral filed objections to the Trustee's denial of customer treatment, and in December 2010, Doral transferred the Doral Claims to CarVal.  (A–687-869, 1043-48.)  Following extensive discovery, the Trustee filed a motion seeking the Bankruptcy Court's approval for his determination that

the Doral Claims and the claims of two other repo claimants were not valid

customer claims.  (*See* A–7, ECF No. 5007.)

On June 25, 2013, the Bankruptcy Court issued its decision upholding the

Trustee's determination that the Doral Claims are general creditor claims not

entitled to SIPA customer treatment.  (*See* SPA–1-21 (Bankr. Court Decision).)

The Bankruptcy Court held that CarVal was "unable to show that the agreements

governing the repurchase transactions in question contemplated the entrustment to

LBI of the securities that were transferred under the terms of the applicable

agreements."  (SPA–3 (Bankr. Court Decision at 380).)

Rejecting CarVal's argument that LBI's contractual promise to resell the

Purchased Securities back to Doral at a future date created a "deemed

entrustment," the Bankruptcy Court stated that CarVal's view was "inconsistent

with a narrow reading of the SIPA definition of customer" and concluded that "[a]

contractual obligation by LBI to return securities is no substitute for an account

statement that includes an inventory of securities actually held by a broker-dealer

for its customer."  (SPA–16-17 (Bankr. Court Decision at 389).)  The court found

that the Repos lacked "the key possessory elements that are needed to establish

entrustment"; LBI was not required to segregate the Purchased Securities; LBI did

not in fact segregate the securities but rehypothecated them for its own account;

and Doral's LBI DVP accounts could not hold property and were empty on the

15

Filing Date. (SPA–14-15 (Bankr. Court Decision at 388).) The Bankruptcy Court held that the Doral Claims are "transactional in nature and arise out of the contractual right, upon fulfillment of the terms of the MRAs," which are "breach of contract claims, not customer claims to recover their securities." (SPA–19 (Bankr. Court Decision at 390).) On July 15, 2013, the Bankruptcy Court entered an Order based on the Bankruptcy Court's decision, confirming the Trustee's determination that Doral is not a SIPA customer. (SPA–22-24.)

### The District Court Proceedings

On July 26, 2013, CarVal filed a Notice of Appeal from the Bankruptcy Court Order (*see* A–25, ECF No. 1), and subsequently filed a motion for certification of direct appeal to this Court, which was denied. (SPA–26-41 (subsequently published at *CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*, 13 Civ. 5381(DLC), 2013 WL 5272937 (S.D.N.Y. Sept. 18, 2013)).)

On February 26, 2014, the District Court issued its decision affirming the Bankruptcy Court's decision that the Doral Claims are general creditor claims not entitled to SIPA customer treatment. (*See* SPA–42-67 (Dist. Court Decision).) The District Court held that Doral is not a customer because "LBI was not 'entrusted' with [Doral's] securities but rather was the intended counterparty in a sophisticated financial transaction" in which the parties only had an "ordinary debtor-creditor relationship." (SPA–57 (Dist. Court Decision at 353-54).) The

16

District Court emphasized that the MRA contains mark-to-market provisions that "protected both parties against changes in the value of the Purchased Securities," and that LBI acquired "full legal title" to the Purchased Securities and was free to use, and did use, the Purchased Securities "for its own purposes." (SPA–47 (Dist. Court Decision at 349).) The District Court concluded that the Repos were not one-sided transfers, and "the two-sided nature of the [Repos] belies any inference of a fiduciary relationship" or entrustment of securities to LBI. (SPA–57 (Dist. Court Decision at 353-54).) The District Court noted that LBI did not use the Purchased Securities for Doral's benefit and that LBI's use of the Purchased Securities "had no connection with [Doral's] trading activity in the securities market"; "LBI did not sell the Purchased Securities to facilitate further securities trading on behalf of [Doral] or use the Purchased Securities to make margin purchases of further securities on behalf of [Doral]." (SPA–58 (Dist. Court Decision at 354).) Rejecting CarVal's arguments founded upon certain rights granted under the MRA, the District Court held that "these are contractual rights, which do not create a fiduciary relationship." (SPA-63 (Dist. Court Decision at 356). The District Court concluded that Doral "failed to establish the indicia of a fiduciary relationship necessary to prove entrustment and thereby to acquire 'customer' status under SIPA." (SPA–63-64 (Dist. Court Decision at 356).) On February 28, 2014, the District Court entered a judgment affirming the Bankruptcy

17

Court's decision and upholding the Trustee's determination that Doral was not a

SIPA customer.  (SPA–68-69.)

## SUMMARY OF THE ARGUMENT

Doral entered into standard, bilateral delivery repo contracts with LBI to

obtain cash by selling the Purchased Securities to LBI to use in its business.  There

was no requirement that LBI segregate property for Doral in the accounts

maintained exclusively for customers, and it did not do so.  Doral's successor seeks

contractual damages for the return of property caused by LBI's breach due to its

liquidation.  There is no dispute that it has a general creditor claim for this breach.

The claimant, however, seeks instead to be treated as a SIPA customer for the

Doral Claims and to share in the fund of customer property intended solely to

satisfy the allowed net equity claims of customers.

Doral was treated only as a contractual counterparty while LBI operated.  It

did not entrust property to LBI in a relationship in which LBI acted as its agent or

custodian.  Its contract disclaimed such a relationship.  LBI was free to use the

Purchased Securities for financing its business and did so.

As Doral was treated before LBI went into liquidation, so must its claim be

treated in the liquidation itself.  It does not have any of the indicia of a customer as

defined by this Court beginning with the *Baroff* case forty years ago and

consistently applied in this and other circuits ever since.  The claimant's efforts to

read the entrustment requirement out of SIPA must be rejected.  Neither its attempt to parse the statute as a way around the entrustment rule, nor its reliance on the very different facts in the *Bevill Bresler* New Jersey district court decision, should distract the Court from following its own consistent understanding of SIPA.

## STANDARD OF REVIEW

This Court's "review of orders issued by a district court in its capacity as an appellate court is plenary."  *In re CBI Holding Co.*, 529 F.3d 432, 448-49 (2d Cir. 2008) (internal citation and quotations omitted).  The Bankruptcy Court's factual findings are reviewed for clear error, and its legal conclusions are reviewed *de novo*.  *Kruse v. SIPC (In re Bernard L. Madoff Inv. Sec. LLC)*, 708 F.3d 422, 426 (2d Cir. 2013).

## ARGUMENT

## DORAL'S CLAIMS ARISING FROM BREACHED REPO CONTRACTS DO NOT QUALIFY FOR CUSTOMER PROTECTION UNDER SIPA.

To prevail in this appeal and to be entitled to share in the fund of customer property, CarVal must show that Doral falls within the SIPA definition of "customer" based on the Repos.  SIPA was "not designed to provide full protection to all victims of a brokerage collapse . . . [SIPA's] purpose was to extend relief to certain classes of customer[s]."  *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974).

The germane portion of the SIPA customer definition as of LBI's Filing Date was as follows:

> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.

SIPA § 78*lll*(2).[9]

CarVal's interpretation of the SIPA customer definition would lead to the conclusion that SIPA customer status has been made available to a wide range of creditors, including those who dealt with LBI on a principal-to-principal basis and never had property set aside for their potential claims as customer property. This is patently wrong. This Court has consistently held that the SIPA customer definition should be narrowly interpreted to correspond with the terms of the statute and allow only those who actually entrusted their property to their broker to recover from the fund of customer property held by the broker. *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006); *Packer*, 498 F.2d at 983.

---

9. Dodd-Frank added a comma between the words "collateral security" but otherwise left this definition intact. Pub. L. 111-203, § 983, 124 Stat. 1376-2223. We believe this was a typographic error, but it does not affect the present appeal regardless.

## A. DORAL CANNOT BE A CUSTOMER BECAUSE IT DID NOT ENTRUST SECURITIES TO LBI.

This Court has emphasized that SIPA's customer definition must be considered in light of its purpose. In *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974), the Court read the customer definition in view of Congress's intent for SIPA to protect the "public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets." Since *Baroff*, this Court has repeatedly held that "[t]he critical aspect of the 'customer' definition [under SIPA] is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 236 (2d Cir. 2011) (emphasis omitted); *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir. 1976).

The entrustment standard requires that (1) the claimed transactions bear the "indicia of [a] fiduciary relationship between a broker and his public customer," and (2) this entrustment of assets be "for some purpose connected with participation in the securities markets." *Baroff*, 497 F.2d at 283-84. The District Court appropriately rejected CarVal's wooden, unrealistic reading of the SIPA customer definition as effectively eliminating the entrustment requirement, and correctly found that Doral did not entrust assets with LBI. (SPA–52-53, 62 (Dist. Court Decision at 352, 356).)

1.  **LBI Did Not Act as Doral's Fiduciary.**

    a.  **Entrustment Requires a Fiduciary Relationship Where a Broker Acts for Its Customer's Benefit.**

SIPA is designed to protect against losses stemming from the debtor-broker's failure to perform its role as custodian of cash or securities. As the Supreme Court stated, SIPC "was established by Congress . . . for the purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had *left cash or securities on deposit*." *SIPC v. Barbour*, 421 U.S. 412, 413 (1975) (emphasis added). *Accord SEC v. SIPC*, 758 F.3d 357, 363 (D.C. Cir. 2014) ("SIPA's definition of 'customer' embodies the Act's focus on a broker's role as custodian of its customers' property."). SIPA's legislative history confirms Congress's intent that not all creditors who suffered a loss as a result of a broker's failure are protected "customers," but rather only those claimants for whom the broker performed a custodial function.[10]

Thus, customer status under SIPA requires that the claimant have entrusted assets to the debtor, meaning that SIPA customer status must be denied if the

---

10. *See Securities Investor Protection: Hearings on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Fin. of the H. Comm. on Interstate and Foreign Commerce*, 91st Cong. 227 (1970) ("This bill is intended, when an insolvency occurs, to insure against the loss of customers' cash and securities which are in the custody of the insolvent broker-dealer."). *See also id.* at 146 (Letter to Chairman Staggers, Chairman of Comm. on Interstate and Foreign Commerce, House of Reps. from Board of Governors of the Fed. Reserve Sys. re proposed legislation) ("[T]he broker performs a custodial function . . . in holding customers' fully paid securities in safekeeping.").

transaction lacks the "indicia of the fiduciary relationship between a broker and his public customer." *Baroff*, 497 F.2d at 284. *See also SIPC v. Exec. Sec. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam); 1 *Collier on Bankruptcy* ¶ 12.12[4][a] (16th ed. 2012) ("The requirement that a relationship between a claimant and a broker-dealer bear the indicia of a fiduciary relationship pervades the statutory requirements for 'customers' under SIPA."). The District Court properly identified the fiduciary relationship as the embodiment of the entrustment test. (*See* SPA–54-57, 62 (Dist. Court Decision at 352-55) ("[A]n entrustment requires a fiduciary relationship.").)

Yet CarVal directly challenges established Second Circuit precedent by asserting that a fiduciary relationship is *not* necessary for SIPA customer status. An entire section of CarVal's brief is titled "District Court Erred in Finding that a Fiduciary Relationship is Necessary for Entrustment." (CarVal Br. 34.) For forty years, this Court has repeatedly made clear—without qualification—that a claimant must have had a fiduciary relationship with its broker-debtor in order to qualify as a SIPA customer. *See Baroff*, 497 F.2d at 284; *Exec. Sec. Corp.*, 556 F.2d at 99. Appellate courts in other circuits unanimously agree that a claimant must show a fiduciary relationship with the broker for SIPA customer status to

vest.[11]  The scope of the fiduciary relationship may vary, but the debtor-broker is always required to be a fiduciary of the claimant, not simply a contractual counterparty.

The legislative history of the SIPA statute confirms Congress's intent that customers must have enjoyed a fiduciary relationship with the debtor-broker. During the 1978 amendments to SIPA, Congress noted that "[t]he definition of 'customer' should include only a person who enjoys the type of fiduciary relationship with the debtor that characterizes customers in general." *Section by Section Explanation of H.R. 8331 Amendments to Securities Investor Protection Act:  Hearing before the Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs*, 95th Cong. 40 (1978).  Thus, CarVal's criticism of the District Court for requiring CarVal to show that LBI was Doral's fiduciary in order to meet the entrustment test (CarVal Br. 34) is simply wrong.  A fiduciary duty is inherent in the act of entrustment itself.

As the District Court summarized, a fiduciary relationship is one where "[o]ne person depends on another—the fiduciary—to serve his interests.  In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the

---

11. *See SEC v. SIPC*, 758 F.3d at 364; *In re Primeline Sec. Corp.*, 295 F.3d 1100, 1110 (10th Cir. 2002); *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1304 n.18 (11th Cir. 2000); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995).

fiduciary with custody over property of one sort or another." (SPA–55 (Dist. Court

Decision at 353) (citing *United States v. Chestman*, 947 F.2d 551, 568-69 (2d Cir.

1991) (en banc)).) The consequence of this fiduciary entrustment is that

"[b]ecause the fiduciary obtains access to this property to serve the ends of the

fiduciary relationship, he becomes duty-bound not to appropriate the property for

his own use." *Id.*[12]

The District Court also accurately described the fiduciary relationship in the

context of a broker and its customer:

> A fiduciary relationship between a customer and a
> broker-dealer ordinarily arises because the customer
> makes a transfer of cash or securities to the broker-
> dealer. With that transfer, the customer becomes
> vulnerable and will suffer a loss if the broker-dealer
> appropriates the money or becomes insolvent. The
> customer thus places trust and confidence in the broker-

--------------------------------------------------

12. CarVal argues that the requirement of a fiduciary duty is overly restrictive because brokers
only have a fiduciary duty with respect to discretionary accounts. (*See* CarVal Br. 34, 39-
40.) This is wrong. As the District Court explained (and as CarVal admits elsewhere in its
brief), there is a general fiduciary duty in discretionary brokerage accounts, but a more
limited fiduciary duty in non-discretionary accounts. (SPA-57 (Dist. Court Decision at 353
n.4).) When a broker has a "general" fiduciary duty, this duty is ongoing between
transactions; when a broker has a "limited" fiduciary duty, this duty exists only on a
transaction-by-transaction basis. *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293,
1302 (2d Cir. 2002) (In a non-discretionary account "[t]he broker's duties ordinarily end after
each transaction is done, and thus do not include a duty to offer unsolicited information,
advice, or warnings concerning the customer's investments."). Therefore, regardless of
whether an account is discretionary or non-discretionary, the broker still has a fiduciary duty
to act for the customer's benefit with respect to every transaction. The mere fact of a broker
receiving assets from another party (such as where the broker is free to use the assets for its
own account) is not sufficient to create an entrustment; this would expand the SIPA customer
definition to apply to almost every act of a broker.

25

> dealer to properly manage his cash or securities, giving
> rise to a fiduciary duty for the broker-dealer to act loyally
> for the customer's benefit.

*Id.*

CarVal's argument that "entrustment" requires nothing beyond the mere transfer of assets to a broker is thus without merit. Where a broker acts as a fiduciary in care of its customer's assets for that customer's benefit, there is an entrustment. By contrast, parties who deal at "arms length in a commercial transaction" generally do not have a "relation of confidence or trust sufficient to find the existence of a fiduciary relationship." *Mid–Island Hosp., Inc. v. Empire Blue Cross and Blue Shield*, 276 F.3d 123, 130 (2d Cir. 2002). For that reason, counterparties of a failed broker may be creditors of the broker, but they are not customers under SIPA.

The District Court accurately appraised CarVal's avoidance of the fiduciary duty requirement when stating that CarVal "read[s] the fiduciary relationship requirement out of entrustment," and adding that "the exclusion of the nature of the relationship, is at odds with Second Circuit precedent, which has consistently emphasized the importance of a fiduciary relationship between the claimant and broker-dealer in demonstrating entrustment." (SPA–62 (Dist. Court Decision at 355-56).)

26

### b.    Doral Did Not Have a Fiduciary Relationship with LBI.

It is manifest from the contract between Doral and LBI that the parties did not have a fiduciary relationship and that, as a result, Doral did not entrust any property to LBI.  The District Court found that "[t]he MRA describes the relationship between [Doral] and LBI as 'contractual' and disavows any fiduciary, principal-agent relationship."  (SPA–58 (Dist. Court Decision at 354); *see* A–459-60, 462, 479-80, 482 (MRA ¶¶ 10, 12).)  Where Doral transferred legal title to the Purchased Securities to LBI on the Purchase Date in exchange for cash, and LBI had complete discretion over how to use the Purchased Securities—including selling them outright to third parties—solely in order to benefit its own account, LBI did not act as Doral's fiduciary and property was not entrusted to LBI.  *See Baroff*, 497 F.2d at 284 (where debtor consistently used loaned securities in its day-to-day business, the required "indicia of [a] fiduciary relationship between a broker and his public customer" were lacking).

Moreover, the MRA granted mark-to-market rights to both LBI and Doral so that both parties would remain protected despite changes in the prices of the Purchased Securities.  (A–457-58, 477-78 (MRA ¶ 4).)  This sort of contractual protection also points away from finding a fiduciary relationship.  *See Exec. Sec. Corp.*, 556 F.2d at 99.  It is evident that the Repos were not a one-sided transfers where LBI acted as fiduciary for Doral's benefit, and "the two-sided nature of the

27

Agreements belies any inference of a fiduciary relationship." (SPA–56-57 (Dist. Court Decision at 353).) *See Tew v. Res. Mgmt. (In re ESM Gov't Sec., Inc.)*, 812 F.2d 1374, 1377 (11th Cir. 1987) (upholding the denial of customer status under the Bankruptcy Code[13] to a repo Buyer who had claimed for cash that was intended as part of the future Repurchase Price because Seller was entitled to use the cash as its own until the Repurchase Date occurred). What is more, pursuant to the MRA, Doral specifically acknowledged that "the Securities Investor Protection Corporation has taken the position that the provisions of the [Securities Investor Protection Act] do not protect the other party with respect to any Transaction hereunder." (A–464, 484 (MRA ¶ 20(a)).)

CarVal points to certain contractual rights that Doral had under the MRA as evidence of "entrustment," but these arguments utterly fail to address the fiduciary relationship requirement inherent in the entrustment rule. CarVal argues that, under the MRA, Doral was entitled to receive payments equal to interest paid by the issuers of the Purchased Securities, and to the return of the exact same securities at the Repurchase Date or earlier if Doral provided equivalent replacement securities. (CarVal Br. 31-33.) But, as this Court stated in addressing similar provisions in *SEC v. Drysdale Sec. Corp.*, "[t]he repo merely imposes a

---

13. The provisions of the Bankruptcy Code and SIPA with respect to the definition of "customer" are substantially similar. *Compare* 11 U.S.C. § 741(2) *with* SIPA § 78*lll*(2).

contractual obligation to deliver identical securities on the settlement date set by the repo contract." 785 F.2d 38, 41 (2d Cir. 1986). Thus, the District Court correctly concluded that CarVal merely pointed to "contractual rights, which do not create a fiduciary relationship." (SPA-63 (Dist. Court Decision at 356).)

In addition to the MRA, LBI's other books and records reflect that LBI did not act as Doral's fiduciary in the Repos. LBI's account opening documents show that Doral elected to open DVP accounts, rather than custodial accounts, which recorded transaction activity but did not hold property. (A–2954-58.) Further, LBI's stock record shows that LBI exercised its rights as title-holder to engage in transactions with the Purchased Securities for its own proprietary benefit. (A–1189-1192, 1210-98); *see* SPA–58 (Dist. Court Decision at 354); SPA–12 (Bankr. Court Decision at 386).) Thus, it is evident from LBI's books and records that LBI and Doral did not have a custodial relationship, nor did LBI execute transactions on Doral's behalf. Rather, LBI and Doral engaged in arm's-length, principal-to-principal transactions in which LBI gained legal title to the Purchased Securities and marshaled them to benefit its own business. (*See* A–459-60, 479-80 (MRA ¶¶ 8, 10); A–1210-98; SPA–55 (Dist. Court Decision at 353) ("One acts in a 'fiduciary capacity' when 'the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person . . . .'" (quoting *Black's Law Dictionary* 564 (5th ed. 1979))).)

Finally, despite CarVal's arguments (CarVal Br. 43-46), repos are not analogous to customer margin transactions even though securities can be rehypothecated in both instances. Margin transactions are distinct and operate under a completely different framework.[14] Whereas the Buyer in a repo transaction obtains legal title to the Purchased Securities, brokers do not obtain title to their margin customers' securities. Thus, a repo Buyer may sell outright the Purchased Securities to a third party, whereas brokers are not permitted to sell margin securities and may only rehypothecate them for certain restricted purposes related to financing customer securities purchases.[15] A repo Seller only has limited substitution rights for the duration of the transaction, whereas a margin customer can recall margin securities at any time by paying off its margin debt. Further, a broker may *not* sell or rehypothecate fully paid-for or excess margin securities in a customer's account, and margin customers (unlike repo counterparties) are protected by the Customer Protection Rule, meaning that a broker in compliance

---

14. LBI had different types of accounts and different agreements for its margin customers compared to its repo counterparties.

15. *See* U.S. Gov't Accountability Office, GAO/GGD-98-153, *Risk-Based Capital, Regulatory and Industry Approaches to Capital and Risk* 139 (1998) ("[T]he [C]ustomer [P]rotection [R]ule restricts the use of customer cash or margin securities to activities directly related to financing customer securities purchases. That is, the broker-dealer may not use customer property as a source of working capital for its operations.").

with the Rule will always have sufficient cash and securities set aside to satisfy a

margin customer's net equity claim.  *See* 17 C.F.R. § 240.15c3-3(b)(1).

2.  **Doral Engaged in Repo Financing Transactions as an Unprotected Creditor Rather than as an Investor-Trader Protected by SIPA.**

    a.  **The Transfer of Securities for Use as Collateral in a Repo Transaction Serves a Financing Purpose Rather than a Trading Purpose.**

The entrustment rule requires not just that the claimant entrust securities to

the debtor as its fiduciary, but that such entrustment occur "for the purposes of

trading securities."  *Madoff*, 654 F.3d at 236 (emphasis and citations omitted).  *See*

*also Baroff*, 497 F.2d at 283 (SIPA customer protection is intended for the "public

customer who has entrusted securities to a broker for some purpose connected with

participation in the securities markets.").  Thus, SIPA distinguishes between true

customers, who are investors "engaged through brokers in trading activities in the

securities markets," and mere lenders "who are relying on the ability of a business

enterprise to repay a loan" and therefore general creditors only.  *New Times*, 463 at

128.  *See also SEC v. SIPC*, 758 F.3d at 365 ("[a] 'person is excluded from

eligibility for customer protection to the extent that person invests *in* the SIPA

debtor by making a loan to the debtor, rather than investing *through* the SIPA

debtor in the securities market as part of the debtor's ordinary course of business as

a broker-dealer.'" (quoting 1 *Collier on Bankruptcy* ¶ 12.12[4][a])).

The objective purpose of a repo transaction is to obtain financing, not to trade in securities. A repo is in economic substance a loan secured by a pledge of collateral. This Court has repeatedly recognized that a repo is the economic equivalent of a secured lending transaction. *Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 221 n.4 (2d Cir. 2012) (stating that "a repurchase agreement . . . is functionally equivalent to a secured loan"); *United States v. Manko*, 979 F.2d 900, 902 (2d Cir. 1992) ("In effect, a repurchase agreement is a loan in the amount of the proceeds of the original sale, collateralized by the [security], with interest equal to the difference between the sale and repurchase prices."); *Drysdale*, 785 F.2d at 41-42. Repos are also accounted for as secured borrowings in a repo Seller's financial statements. (*See* A–1118-48.) The financial world universally considers repo transactions to be a source of funding, providing the Seller with the ability to obtain financing at cheaper rates than otherwise available because the cash transferred from the Buyer to the Seller is secured by the Purchased Securities. *See* n.6, *supra*. It is well established that secured lending does not give rise to protected customer status under SIPA. *See Exec. Sec. Corp.*, 556 F.2d at 99 (denying customer status based on secured loan where the parties had protected themselves against loss through the posting of collateral on a mark-to-market basis).

This conclusion applies with even more force to repo transactions. Because repo transactions—which have the aim of providing financing rather than engaging in securities trading—exhibit the same salient characteristics as secured loans, repos should be denied customer status under the same rationale. *See Baroff*, 497 F.2d at 284 (holding that a claimant who took a "circuitous route of lending securities with permission to hypothecate so as to enable the broker to obtain cash . . . would obviously be outside of [SIPA's] definition of 'customers' which covers cash deposits only if they are 'for the purpose of purchasing securities'"). The standard MRA provides repo participants like Doral with the same mark-to-market rights as parties to a secured loan. (*See* A–457-58 (MRA ¶ 4(a),(b)).)

Indeed, after noting the functional similarity of repos and secured lending, this Court in *Drysdale* identified the only significant difference between repos and secured loans—that "the secured 'lender' in a repo is free to deal the 'collateral'" because "repo 'lenders' take title to the securities received and can trade, sell or pledge them." 785 F.2d at 41. Thus, because a repo Buyer has *more* rights to the collateral (including the right to outright sell it), a repo Seller/"borrower" has bargained for even less protection than a borrower in a traditional secured loan. As the District Court recognized, "[a] purchase/sale bears even fewer indicia of a fiduciary relationship than a secured loan, as a creditor has greater fiduciary obligations to the debtor than a purchaser does to a seller." (SPA–60 (Dist. Court

Decision at 355).)  The District Court correctly reasoned that "[a]ccordingly, if a secured loan lacks the indicia of a fiduciary relationship necessary for a finding of entrustment, then a purchase/sale certainly cannot meet the entrustment requirement."  (SPA–60 (Dist. Court Decision at 60-61) (citation omitted).)  Thus, whether a repo transaction is looked at as the functional equivalent of a secured loan or as a legal purchase and sale, it is not entitled to customer treatment.[16]

### b.    Doral's Purported Motives for Engaging in the Repo Transactions Do Not Alter Its Status as a Mere Secured Borrower.

Doral's purported motives for engaging in the repo transactions do not alter its status as a mere secured borrower.  Like all counterparties to bilateral repos, Doral had the objective purpose of entering into financing transactions.  The District Court compared the Repos to the secured loans that were denied customer status in *Baroff*:

> LBI did not sell the Purchased Securities to facilitate
> further securities trading on behalf of the Banks or use
> the Purchased Securities to make margin purchases of

---

16. CarVal incorrectly assumes that every purchase/sale transaction would be entitled to customer status.  (*See* CarVal Br. 36.)  While a purchase/sale transaction where the claimant delivers securities into the hands of its broker and then asks its broker to execute a sale to a third party on its behalf may qualify for customer treatment, a principal-to-principal transaction between a broker-dealer and the claimant where each party acts for its own benefit does not qualify.  *See, e.g.*, *Exec. Sec. Corp.*, 556 F.2d at 99; *Baroff*, 497 F.2d at 284.  Certainly, if a third counterparty separately sells securities to a broker-dealer and is paid in cash, that counterparty cannot claim that the securities delivered into the hands of the broker are its property at all, much less customer property.

> further securities on behalf of the Banks. The Banks had
> no reasonable expectation that LBI would sell or use the
> Purchased Securities in the near future for these purposes
> on behalf of the Banks. To the contrary, LBI used, and
> was permitted by the Agreements to use, the Purchased
> Securities in its own day-to-day business.

(SPA–58 (Dist. Court Decision at 354).)  Doral itself repeatedly acknowledged the

functional similarities of repos to secured loans in its public filings,[17] and its

witnesses testified to the same effect.[18]  Doral's repos were akin to secured

borrowings, and SIPA customer status must be denied for the same reasons it is

consistently denied in the secured lending context.

CarVal makes a number of arguments in an attempt to lump Doral in with

actual customers.  First, CarVal argues that Doral had an investment purpose to

trade in the securities market because the Repos "were a means for Doral to

acquire and take positions in Agency securities."  (CarVal Br. 29-30.)  But as a

simple matter of common sense, when Doral took securities to which it had title

---

17. Consistent with industry practice, Doral accounted for reverse repos as "secured borrowings"
or "financing transactions" in their Form 10K's.  (*See, e.g.*, A–4076 ("[T]he amounts
received under these [repurchase] agreements represent borrowings."); A–4061 (listing
"Repurchase agreements" under "Sources of Borrowings").)

18. As CarVal's expert witness herein testified in a previous case, "[a] repurchase obligation is a
sale of security with an obligation to repurchase, hence the name 'repurchase obligation.'
The form of the document makes clear what it really is is a secured borrowing."  *In re Hugo
Neu & Sons, Inc.*, DTA No. 811472, 1994 N.Y. Tax LEXIS 711, at *18-19 (N.Y. Div. Tax
App. Dec. 15, 1994) (internal quotations omitted).  Another witness whose testimony was
offered against the Trustee agreed that "[i]n practice, a repo is essentially a loan for cash for a
specified period of time against with which [sic] interest is paid and collateral is pledged."
(A–4805).)

and transferred those securities to LBI in the repo transactions in return for cash, transferring legal title to LBI, Doral did not thereby "acquire and take positions" in the securities it had just sold to someone else.

Furthermore, if Doral chose to use the cash received from LBI in the first leg of the repo transaction in order to purchase more securities (or even those very same securities), that would not transform the sale of securities to LBI for its own use into an entrustment of securities to enable Doral to participate in the securities market. CarVal's expert himself admitted that entering into a transaction to borrow money to buy securities is not the same thing as buying securities. (A–4191 (Appellant's expert agreeing that "borrowing money to make an investment is not—is not itself making an investment")).) The objective purpose of a repo transaction itself is to provide a source of financing, regardless of what sort of subsequent trading activity may or may not have been spurred as a result of that financing. *See Exec. Sec. Corp.*, 556 F.2d at 99 (Where securities lender "may have used the proceeds of the loan to carry on other investment activity, such subsequent investments were not made through [debtor/broker]," so lender did not have a customer securities claim.). Not only is Doral's subjective intent as to how to use the cash received in the Repos irrelevant, but Doral has admitted that it used

the funds received from LBI in the Repos for purposes unrelated to trading in the securities market.[19]

CarVal's other arguments fare no better. It emphasizes Doral's right to receive "the exact same securities" "on demand" through its substitution rights on or before the Repurchase Date. (CarVal Br. 31.) However, Doral's limited substitution rights do not amount to entrustment. Doral's rights to the securities were restricted, as it merely had the *contractual* right to receive the securities prior to the Repurchase Date if Doral substituted collateral, and Doral could only effect substitution "subject to agreement with and acceptance by Buyer"—that is, Doral's substitution "right" was entirely conditioned upon LBI's consent. (*See* A–459, 479 (MRA ¶ 9(a)); SPA–6 (Bankr. Court Decision at 383.) To bolster this argument, CarVal cites to SIPA legislative history, asserting that "Appellant is entitled to the protection of SIPA, which 'was intended to protect those customers with 'an unrestricted right to receive on demand [ ] securities which belong to them.'" (CarVal Br. 32 (quoting *In re Weis Inc.*, 73 Civ. 2332, 1977 WL 1043, at *4 (S.D.N.Y. Sept. 29, 1977) (quoting H.R. Rep. No. 91-1613 (1970)).) This snippet

_____

19. Doral's Form 10K's filed with the SEC make this apparent. (*See, e.g.*, A–4069 ("Doral Financial's banking subsidiaries obtain funding for their lending activities through the receipt of deposits, through repurchase agreements . . . ."); A–4059 (referring to "repurchase agreements used for funding loan origination activities"); A–4050 ("Doral Financial uses the proceeds of such sales to repay borrowings under its warehousing lines of credit and to finance the cost of carrying mortgage backed securities and other investment securities.").)

of legislative history is not helpful to CarVal.  First, the Purchased Securities that Doral *sold* to LBI clearly did not "belong to" Doral after title was conveyed to LBI, so this quotation is inapplicable on its face.  (*See* A–459, 479 (MRA ¶ 8).)  In addition, when one views the *entirety* of the language from which CarVal quotes, it is even clearer that Doral does not fit within the class of claimants that Congress sought to protect.  The House Report reads as follows:

> Broker-dealers also hold substantial amounts of customer securities for safekeeping.  While customers have an unrestricted right to receive on demand these securities which belong to them and are fully paid for, there is an inevitable risk that they may be transferred improperly or may be reached by creditors of the broker-dealer if the difficult and technical legal requirements of 'segregation' are not observed.

H. Rep. No. 91-1613, at 448.  The very language upon which CarVal relies shows that SIPA intended to protect a customer's fully paid-for securities held by the broker in safekeeping as a fiduciary for the customer.  Instead, Doral received cash from LBI at its own third-party bank, and Doral could use this fungible cash for any number of purposes.  None of CarVal's arguments can alter the fact that Doral transferred securities to LBI to receive financing, not to engage in securities trading.[20]

---

20. CarVal's other arguments that Doral was an "investor" who sought to participate in the securities market (CarVal Br. 30-33)—that Doral had a contractual promise from LBI that it would receive interest income on the Purchased Securities, had alleged exposure to market

(Footnote continued on next page)

**B.  DORAL DOES NOT QUALIFY AS A SIPA CUSTOMER UNDER THE TEXT OF THE STATUTE.**

**1.  The District Court Properly Rejected CarVal's Unrealistic Interpretation of the SIPA Customer Definition Because the Statute Must Be Read with a View to Its Purpose.**

CarVal misunderstands the entrustment requirement when it incorrectly criticizes the District Court for supposedly "failing to consider the elements of the customer definition when denying customer status to the Appellant."  (CarVal Br. 22.)  Entrustment is not an additional or alternative test separate and apart from the statute's customer definition.  Rather, this Court's case law provides the correct approach to reading that definition—that is, the entrustment rule is a requirement to read the customer definition in light of SIPA's purpose of protecting persons who have placed their property in a broker-dealer's care.  It is a well-settled principle of statutory construction that a statute should be read in light of its purpose as a whole.  *See McCarthy v. Bronson*, 500 U.S. 136, 139 (1991).  Accordingly, the SIPA statutory language cannot be parsed except through the lens of the entrustment requirement.  A more direct examination of the SIPA customer definition confirms that CarVal does not qualify as a SIPA customer under any of

---

(Footnote continued from prior page)

risk, and accounted for the Purchased Securities as Doral's assets on their books—are all equally applicable to the rights of a borrower with respect to securities it pledged as collateral in a secured loan, who is not afforded customer treatment.  These facts are also not indicative of entrustment for the reasons stated in Section A*, supra*.

the several phrases of the statutory language.  (*See* SIPA customer definition at 20,

*supra*.)

### a.    The Repo Claims Are Not "On Account of Securities Received, Acquired, or Held."

Contrary to CarVal's assertion (CarVal Br. 11), the Trustee has not

"admitted" that the Purchased Securities were "received, acquired or held" within

the meaning of the statute; the Trustee merely agreed that the Purchased Securities

were transferred in repo transactions through DVP accounts.  (*See* A–2588 at 2.)

The Doral Claims are for contract damages based on LBI's breach of the MRA, not

claims for the return of securities held in safekeeping.  In fact, Doral's claim forms

submitted against the LBI estate specifically, and correctly under paragraph 11 of

the MRA, state that it is *not* owed securities.  (A–523, 632.)  A claim that is not for

securities may nonetheless fit the SIPA customer definition where that cash claim

is "on account of securities" in the manner described in the subsequent portion of

the customer definition.  The relevant portion of the statute states that "[t]he term

'customer' includes . . . any person who has deposited cash with the debtor for the

purpose of purchasing securities."  SIPA § 78*lll*(2).  Although the Doral Claims

were for cash amounts rather than for securities, Doral has never relied upon the

portion of the SIPA customer definition specifically addressed to a customer's cash

claim.  This is because Doral did not deposit (nor even transfer) cash to LBI.

Doral has neither a claim for securities nor a claim for cash deposited for the

purpose of purchasing securities, so it does not have a claim "on account of securities" and cannot qualify as a SIPA customer.

### b. LBI Did Not Receive the Securities "From" or "For" Doral's "Securities Accounts."

The next few words of the SIPA statute provide the essence of the entrustment rule. The statute provides that securities must not merely be "received, acquired, or held," but that they be "received, acquired, or held" "from or for the securities accounts of [claimant]." SIPA § 78*lll*(2). The statutory language suggests, and the entrustment rule confirms, that the broker must have obtained possession of securities as a fiduciary bound to act on the claimant's behalf. CarVal indeed concedes that "[t]he phrase 'for the customer's account' has been interpreted to mean 'on [claimant's] behalf.'" (CarVal Br. 27-28.) The language that the claimed securities must be "from or for the securities accounts of [claimant]" is just that—a requirement that the broker was expected to act on the claimant's behalf concerning property owned by the claimant. CarVal's conclusory statement that the Purchased Securities were "received and acquired by LBI on Doral's behalf" is not supported by any evidence that LBI acted for Doral's benefit. (*See* CarVal Br. 28.) CarVal cannot show that LBI acted on Doral's behalf because LBI acted only for its own account in the Repos.

Moreover, Doral did not even *have* "securities accounts" for the repo transactions. Instead, Doral chose to open DVP accounts which by their nature

were not intended to hold securities because they only serve a bookkeeping, not a depository, function. For this reason, the Purchased Securities were transferred at the start of the Repos from Doral's third-party bank to an LBI proprietary account located at LBI's third-party bank. (A–1474-75; *see* A–1202-05.) Doral simply did not maintain "securities accounts" at LBI and did not entrust any cash or securities to LBI's care in the Repos.

### c. LBI Did Not Receive, Acquire, or Hold the Securities "with a View to Sale" or "Pursuant to Purchases."

LBI also did not receive or acquire the Purchased Securities in the Repos for the purpose of executing transactions in the securities market on Doral's behalf, as the statutory language and the entrustment rule would require, so Doral is not a customer. CarVal argues that the Purchased Securities were received by LBI with a "view to sale" by LBI to third parties. (CarVal Br. 25.) However, LBI used the Purchased Securities at its own discretion and solely for its own benefit, and Doral cannot be a customer based on LBI's transactions for its own account from which Doral received no benefit. Alternatively, CarVal argues that the Purchased Securities were received by LBI with a "view to sale" back to Doral or "pursuant to purchases from Doral." (*Id.*) LBI only had a contractual duty to buy the securities on the Purchase Date and then sell them back on the Repurchase Date. *SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir. 1986). LBI's contractual duty to buy from or sell to Doral was not a fiduciary duty to buy or sell for Doral.

42

It would be an unwarranted and immeasurable expansion of the SIPA customer definition to interpret "purchase" or "sale" to include transactions with every party who buys from or sells to a broker-dealer at arm's length. *See, e.g.*, *SIPC v. Exec. Sec. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam); *Baroff*, 497 F.2d at 284.

## 2. Doral's DVP Accounts Did Not Hold Positions, So Doral's "Net Equity" Calculation Under SIPA Is Zero.

Further confirmation that Doral's claims are not entitled to customer protection is found in SIPA's provisions setting forth the calculation of customer claims. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." (citation omitted)). The manner in which a SIPA trustee is to calculate the amount owed to a customer provides guidance on the category of claimants covered by the SIPA customer definition. Put another way, if a claimant could not be entitled to payment under SIPA's provisions for calculation of customer claims, this strongly indicates that the statute did not intend for such claimant to qualify as a customer. Courts have routinely looked to the cash or securities positions in a customer's account as of the commencement of a SIPA liquidation to calculate a customer's allowable claim amount. *See, e.g.*, *New Times*, 463 F.3d at 129.

SIPA's provision on the payment of customer claims provides that customers should be paid to the extent of their "net equity." SIPA § 78fff-4(c). A customer's "net equity" is determined under SIPA as follows:

> [T]he dollar amount of the account or accounts of a customer, to be determined by . . . calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date . . . all securities positions of such customer (other than customer name securities reclaimed by such customer) . . . minus . . . any indebtedness of such customer to the debtor on the filing date.

SIPA § 78*lll*(11).

Where a claimant does not *have* securities "positions" in its account on the Filing Date, the trustee cannot perform a net equity calculation. *See SEC v. Kenneth Bove & Co.*, 378 F. Supp. 697, 700 (S.D.N.Y. 1974) (explaining that entrustment requires "receipt, acquisition or holding of the securities by the Debtor in the evident sense required by the Act—that is, an actual possession—so as to ground a protected 'net equity'"). Stated differently, where a claimant's account is empty, its net equity calculation would be zero, and it would not be entitled to a payment from the trustee's fund of customer property set aside for SIPA customers.[21]

---

21. The exception to this is where a claimant's accounts are empty due to the broker's fraud or misfeasance, a circumstance not relevant to the present appeal. *Cf. In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011).

Here, where LBI obtained legal title to the Purchased Securities from Doral and rehypothecated them as was its right to do under the MRA, the Purchased Securities were in the possession of third parties (or in LBI's proprietary account) on the Filing Date. (*See* A–459, 479 (MRA ¶ 8); A–1191-92, 1210-98.) Because Doral's DVP accounts did not hold securities or cash on the Filing Date, Doral did not have any "securities positions" at LBI, Doral's net equity with respect to the repo transactions is zero, and it has no customer claim.

### 3. CarVal's Congressional Intent Arguments Fail Under Basic Principles of Statutory Interpretation.

CarVal argues that repo participants were "never excluded" in so many words from SIPA's customer definition and leaps to the insupportable conclusion that Congress therefore meant to include them in the customer definition. (CarVal Br. 5.) To the contrary, the narrowly-crafted customer definition consists of a series of requirements that a claimant has the burden to affirmatively demonstrate. *See* SIPA § 78*lll*(2). While Congress enumerated certain circumstances where claimants were specifically barred from receiving customer treatment, these express exclusions do not purport to be an all-encompassing list of non-customers. For this reason, CarVal's reliance on *Bell v. Bell*, 225 F.3d 203, 214 n.15 (2d Cir. 2000), is misplaced. (*See* CarVal Br. 52-53.) In *Bell*, the relevant statute contained a blanket rule followed by a closed list of exceptions to that rule. *Bell*, 225 F.3d at 212-14. In contrast, the "exceptions" to the SIPA customer definition

are mere examples and not intended to be the totality of exclusions from the definition.  *See* SIPA § 78*lll*(2).

To require every "exclusion" from the SIPA customer definition to be specifically enumerated would render the definition itself superfluous.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (explaining that "courts are to interpret the words of a statute in context" so "effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (citation omitted)).  Furthermore, as the District Court noted, CarVal's "negative implication" argument must fail because there is no basis to suggest that Congress, during the 1978 SIPA amendments to which CarVal refers, considered excluding repos and then decided not to.  (SPA–65-66 (Dist. Court Decision at 357) (citing *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80-81 (2002)).)  The Supreme Court has repeatedly held that Congressional silence lacks persuasive significance.  *See Brown v. Gardner*, 513 U.S. 115, 121 (1994); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186-87 (1994) (citation omitted).  There is no evidence that Congress *ever* discussed repos in the context of the SIPA customer definition prior to LBI's bankruptcy.[22]

---

22. The cases cited by CarVal are not on point.  In those cases, Congress had explicitly discussed the statutory provision at issue before refusing to adopt it.  (*See* CarVal Br. 56 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013); *INS v. Cardoza–Fonseca*,

(Footnote continued on next page)

CarVal also cites to language contained in one draft of Dodd-Frank (H.R. 4173, 111th Cong. § 7509(b)(2)(C)(iii) (Dec. 10, 2009)) that would have expressly excluded repos from the customer definition to argue that Congress has within the years since LBI's liquidation commenced "refused" to amend SIPA's customer definition to exclude repos.  (CarVal Br. 55-58.)  *Cf.* Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank"), Pub. L. No. 111-203, 124 Stat. 1376-2233, codified at 12 U.S.C. §§ 5301 *et seq.* (2010).[23]  However, any legislative history of Dodd-Frank is irrelevant because it was introduced and enacted after LBI's bankruptcy.  It is well established that the version of SIPA as it existed on the Filing Date is applicable, so subsequent amendments have no bearing.  *See New Times*, 463 F.3d at 128-29.  (*See also* SPA–66 (Dist. Court Decision at 357).)  As the District Court correctly noted, CarVal's attempts to rely on post-enactment legislative history are contrary to established principles of statutory interpretation, and "[a]ccordingly, the Dodd-Frank Act's legislative

_____

(Footnote continued from prior page)

480 U.S. 421 (1987); *Pan Am. World Airways, Inc. v. Civil Aeronautics Bd.*, 380 F.2d 770 (2d Cir. 1967), *aff'd sub nom. World Airways, Inc. v. Pan Am. World Airways, Inc.*, 391 U.S. 461 (1968) (per curiam)).)  Here, there is no indication that Congress ever mentioned repos with respect to the SIPA customer definition.

23. The language cited by CarVal was not included in the draft of Dodd-Frank passed by the Senate, nor the one approved by the Conference Committee.  *See* H.R. 4173, 111th Cong. § 983 (as passed by Senate, May 20, 2010); H.R. Rep. No. 111-517, at 566-67 (2010) (Conf. Rep.).  We have located no information to make a supportable inference as to *why* the draft language was not included, and CarVal has not pointed to any.

history is not available to construe the term 'customer' in this case." (SPA–66-67

(Dist. Court Decision at 357).) *See Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068,

1081-82 (2011) ("post-enactment legislative history by definition 'could have no

effect on the congressional vote . . .'"); *United States v. Price*, 361 U.S. 304, 313

(1960).[24]  In addition, CarVal fails to provide any evidence that Congress engaged

in any debate over the issue one way or the other.  *See Zuber v. Allen*, 396 U.S.

168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness,

preoccupation, or paralysis.  'It is at best treacherous to find in Congressional

silence alone the adoption of a controlling rule of law.'" (quoting *Girouard v.*

*United States*, 328 U.S. 61, 69 (1946))).  Congressional inaction in amending the

---

24. CarVal makes the additional argument that it should nonetheless be able to rely on Dodd-Frank post-enactment legislative history where Dodd-Frank was a "change to an actual statute" as opposed to mere information from a Congressional report in order to support its (erroneous) assertions that Dodd-Frank amended the Bankruptcy Code definition of customer to exclude reverse repo participants.  (CarVal Br. 57-58.)  This distinction is irrelevant because regardless of the form of post-enactment legislative history, one simply cannot deduce the views of an earlier Congress from the views of a later Congress.  *Price*, 361 U.S. at 313 ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").  Worse, in citing to Dodd-Frank, CarVal seeks to rely on the post-enactment legislative history for a statute *other than* SIPA.  Equally problematic, CarVal's description of Dodd-Frank as an amendment to the Bankruptcy Code definition of customer (CarVal Br. 56-57) is inaccurate.  The relevant language merely amended a section of the Securities Exchange Act regarding swap transactions, clarifying how the customer definition under the Bankruptcy Code should be applied for purposes of *that* Act.  *See* Dodd-Frank, Pub. L. No. 111-203, § 763(d), 124 Stat. 1776-77 (2010) (amending the Securities Exchange Act by inserting a new section, 15 U.S.C. § 78c-5(g)).  Dodd-Frank did *not* amend the customer definition in the Bankruptcy Code itself.  *See* 11 U.S.C. § 741(2) (purported new language absent from the Bankruptcy Code customer definition).  If anything, Congress's clarification that the Bankruptcy Code customer definition should not include repo participants would be evidence of Congress's intent that repos should similarly *not* be afforded customer status under SIPA.

customer definition in no way indicates an intent to affirmatively include repo participants in the SIPA customer definition.

## C. *BEVILL* DOES NOT CONTROL, AND IS DISTINGUISHABLE AND OUTDATED.

CarVal continues to rely heavily on the decades-old New Jersey District Court decision in *Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.) ("Bevill")*, 67 B.R. 557 (D.N.J. 1986). (See CarVal Br. 47-58.) CarVal misrepresents the precedential value of *Bevill*, referring to it as "controlling precedent on this issue." (CarVal Br. 48.) In reality, *Bevill* is a 1986 district court decision from another circuit that is not controlling on this Court, nor was it controlling on the District Court or the Bankruptcy Court.

In any event, the facts in *Bevill* are distinguishable from the current appeal. Most importantly, and as the Bankruptcy Court found, *Bevill* involved HIC repos. (SPA–19-20 (Bankr. Court Decision at 391).) Contrary to CarVal's statement that "safekeeping of securities was irrelevant to the *Bevill* court's finding that reverse repo participants were customers" (CarVal Br. 51), whether used in a repo or a reverse repo, the Purchased Securities that gave rise to SIPA customer status in *Bevill* all remained (or were supposed to have remained) in the debtor's possession. 67 B.R. at 600.

Indeed, it has widely been recognized that the HIC issue was the key to the finding of SIPA customer status in *Bevill*. In *Tew v. Res. Mgmt. (In re ESM Gov't*

*Sec., Inc.) ("ESM")*, the court stated that the "key factor" in *Bevill* was that the "debtor maintained specific trading accounts in which the securities, while owned by the purchaser, were held for the purchaser by the debtor/seller." 812 F.2d 1374, 1377 (11th Cir. 1987). The *ESM* court, which issued its decision only a year after *Bevill*, noted that although HIC repos were common at that time, the repo Buyer before the court nonetheless "insisted" on bilateral delivery repos. *Id.* at 1375. The *ESM* court thus distinguished the facts before it from the facts in *Bevill*, noting that in *Bevill* there was a fiduciary relationship because the debtor was holding assets for the claimant, whereas for the bilateral delivery repos in *ESM*, there was no such fiduciary relationship.[25] The District Court followed this logic below when it stated that "unlike the claimants in *Bevill Bresler*, [Doral] had DVP accounts, not ordinary customer accounts used for investing and trading." (SPA–56 (Dist. Court Decision at 357).)

CarVal also incorrectly states that Bankruptcy Court and District Court decisions "are the *only* decisions in which a court has held that repos or reverse

---

25. That the hold-in-custody character of the repos in *Bevill* was crucial to its holding is also demonstrated by news reports at the time confirming that safekeeping was the rationale for the decision conferring customer status on those repo participants. *See Bevill, Bresler Ruling Settles Test Cases*, Associated Press (Oct. 28, 1986), *available at http://www.apnewsarchive.com/1986/Bevill-Bresler-Ruling-Settles-Test-Cases/id-a17280120a4a4a889f2ea97dcc273a2f* (stating the *Bevill* decision "refused to remove Bevill, Bresler's customers from the protection of the federal Securities Investor Protection Corp. and affirmed that *securities in safekeeping* actually meant they belonged to the investor [repo buyer or seller].") (emphasis added).

repos do not give rise to customer status." (CarVal Br. 47.) In *ESM*, the only circuit court decision to consider customer status for repos (albeit under the Bankruptcy Code rather than SIPA), the Eleventh Circuit affirmed that the repo counterparty before it was not a customer. *See ESM*, 812 F.2d at 1377. The claimant-buyer in *ESM* was engaged in repo (as opposed to reverse repo) transactions with the debtor-seller, and made a customer claim for cash. *Id.* The Eleventh Circuit held that, despite the debtor-seller's contractual duty to use the cash to buy back the securities on the Repurchase Date, until the Repurchase Date occurred the cash belonged to the debtor-seller rather than the claimant-buyer; there were no indicia of a fiduciary relationship and the claimant-buyer was not a customer. *Id. ESM* is analogous to Doral's reverse repos with LBI, where LBI had a contractual duty to sell back the securities on the Repurchase Date, but until the Repurchase Date occurred, the securities belonged to LBI.

Moreover, the repos in *Bevill* operated in a completely different regulatory framework from the modern repo transactions at issue here. A series of broker failures involving HIC repos —including the Bevill Bresler liquidation—led to major regulatory changes affecting repo transactions. Congress enacted the Government Securities Act of 1986, Pub. L. No. 99-571, 100 Stat. 3208 (1986), and the SEC promulgated amendments to the Customer Protection Rule which became effective in 1988. (A–1173-74.) *See Customer Protection Rule*, Exchange

Act Release No. 34-24778, 52 Fed. Reg. 30331, 30331 (Aug. 6, 1987). The SEC

determined that an exception should be made to the general rule that a broker-

dealer was not obligated to segregate or hold in secure custody any cash or

securities received from a repo counterparty, concluding that HIC repos should be

protected. (A–1174.) Significantly, the SEC explained that it was addressing

perceived weaknesses in the HIC repo market and did not extend these protections

to all repos. (*Id.*) *See Customer Protection Rule*, 52 Fed. Reg. at 30332. Thus,

bilateral delivery repo transactions, such as the Repos in this case, remain

unprotected. *See* 17 C.F.R. § 240.15c3-3.

Similarly, *Bevill* operated under a completely different contractual

framework and was decided prior to the promulgation of the modern MRA[26]

(executed by Doral and LBI) that now includes provisions related to the parties'

rights in the event of default, a warning that repos may not be protected by SIPA,

and provisions providing mark-to-market rights to protect *both* parties from the

---

26. The other cases cited by CarVal (*see* CarVal Br. 47-48) similarly did not examine repo transactions conducted under a modern-day MRA. These cases are also outside this circuit and did not deal with SIPA. *See City of Elkins v. Davidson (In re Swink & Co.)*, 142 B.R. 874 (Bankr. E.D. Ark. 1992); *Thomson McKinnon Sec., Inc. v. Residential Res. Mortg. Invs. Corp. (In re Residential Res. Mortg. Invs. Corp.)*, 98 B.R. 2 (Bankr. D. Ariz. 1989). The lone case from this circuit cited by CarVal in approval of *Bevill* was a preliminary bench ruling in *In re Refco Sec. Litig.* that was never finalized. The *Refco* judge's statements about repo transactions were a few passing lines made in dicta as part of a 288 page transcript, and the judge was explicit that he was not making any ruling with respect to repo counterparties or any party other than the margin claimants that were before the court. (*See* A-3593-94, 3607.)

fluctuation in the market value of securities.[27] (*See* A–460-64, 480-84 (MRA ¶¶ 11, 17-18, 20(a)); A–1168-69; *Bevill*, 67 B.R. at 590). Contractual mark-to-market protections were an important factor in this Court's decision to deny customer status to secured lenders. *See SIPC v. Exec. Sec. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam).[28]

Finally, even if *Bevill* could be interpreted to apply more broadly to non-HIC, bilateral delivery repos, or to repos under the modern-day MRA, that court's reasoning is inconsistent with Second Circuit precedent and should be rejected. Foremost, the *Bevill* court did not engage in the entrustment analysis required by this Court. Although the court baldly declared that there was a fiduciary relationship, it made no attempt to offer an explanation as to why such a relationship existed. CarVal mechanically cites *Bevill* in support of its position,

---

27. In *Bevill*, only the broker was protected against changes in the price of the securities. 67 B.R. at 590. Thus, when the *Bevill* court concluded that the broker's repo counterparties were subject to market risk, it was because they did not receive contractual mark-to-market protections as they do today.

28. The Trustee believes that the District Court's distinction between short-term and long-term repos under *Bevill* was misplaced. (*See* SPA-64-65 (Dist. Court Decision at 356-57).) However, the District Court correctly distinguished the facts in *Bevill* upon additional grounds, finding that "unlike the claimants in *Bevill Bresler*, [CarVal] had DVP accounts, not ordinary customer accounts used for investing and trading," and concluding that "[t]hus, *Bevill Bresler* does not suggest that the [MRAs] created a fiduciary relationship between [Doral] and LBI." *Id.* The key distinction in *Bevill*—that claimants had hold-in-custody repos such that the securities remained in the debtor's possession—applies equally to all bilateral delivery repos (including Doral's repos with LBI) regardless of whether they are short or long term.

but only engages in a cursory analysis of the substance of the decision, ultimately failing to explain why it was decided correctly or why its reasoning is applicable today. Regardless of how broadly one interprets *Bevill*, today's market participants understand that repurchase transactions function like secured loans, and the market and regulatory system operate accordingly. *See* n.6, *supra*.

## CONCLUSION

The Court should affirm the District Court's judgment and uphold the Trustee's determination that Doral was not a SIPA customer.

Dated: September 24, 2014
New York, New York

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By:   /s/ Michael E. Salzman
James B. Kobak, Jr.
Michael E. Salzman
Beatrice Hamza Bassey
Savvas A. Foukas
Kathleen A. Walker
One Battery Park Plaza
New York, New York 10004

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

## Certificate of Compliance with Type-Volume Limitation, <u>Typeface Requirements, and Type Style Requirements</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2) because it contains 13,842 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

Dated: New York, New York
    September 24, 2014


       HUGHES HUBBARD & REED LLP

       By: <u>/s/ Michael E. Salzman</u>
         Michael E. Salzman
       One Battery Park Plaza
       New York, New York 10004
       Telephone:  (212) 837-6000
       Facsimile:  (212) 422-4706
       Email:  salzman@hugheshubbard.com

       *Attorney for James W. Giddens,*
       *as Trustee for the Securities Investor*
       *Protection Act Liquidation of Lehman*
       *Brothers Inc.*